UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THOMAS O'HEARN EIFLER, JR. | ) | Case No. 11-36154 |
| Debtor | ) | |
| | ) | |
| WILSON & MUIR BANK & TRUST | ) | |
| COMPANY, | ) | |
| Plaintiff | ) | |
| vs. | ) | AP No. 12-3052 |
| | ) | |
| THOMAS O'HEARN EIFLER, JR. | ) | |
| Defendant | ) | |

**MEMORANDUM**

This matter came before the Court for trial commencing on April 23, 2013, on the Amended

Complaint (1) to Determine Dischargeability of Debt under 11 U.S.C. §§ 523(a)(2)(A) and (B)

and (6), and (2) to Object to Discharge of Debts Under §§ 727 (A)(2), (4), and (5)[1] filed by the Plaintiff,

Wilson & Muir Bank & Trust Company ("Wilson & Muir"). The Debtor, Thomas O'Hearn Eifler,

Jr. ("Eifler"), Eifler's counsel, a representative from Wilson & Muir, and Wilson & Muir's counsel

all appeared before the Court. Following trial, the Court allowed the parties to file post trial briefs

on Eifler's "advice of counsel" defense. Upon consideration of the testimony and exhibits presented

at trial, the briefs filed, and the argument of counsel, the Court enters the following Findings of Fact

and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052.

---

[1] The Amended Complaint included an allegation under 11 U.S.C. § 523(a)(2)(B).
Plaintiff did not include this allegation in its pre-trial brief, or otherwise address this allegation.
As such, the Court will treat the allegation as waived. Additionally, the Amended Complaint
added a Count VI alleging a violation of 11 U.S.C. § 727(a)(4)(C). During the course of the
trial, Wilson & Muir withdrew this Count.

## FINDINGS OF FACT

1.    Eifler filed for bankruptcy on December 29, 2011, nearly a year after his businesses were insolvent and a year after he personally could not meet his guaranty obligations on several commercial notes to Wilson & Muir.

2.    Approximately two weeks later, on January 13, 2012, Eifler, as company representative, filed seven other inter-related bankruptcy actions on behalf of companies in which he had an ownership interest. These bankruptcy actions included the following:

    a.    In re Eifler Construction Hoist Company, LLC, Case No. 12-30140;

    b.    In re Eifler Tower Crane & Hoist Co., LLC, Case No. 12-30140;

    c.    Tace Holdings, LLC, Case No. 12-30145;

    d.    Eifler Tower Crane Co., LLC, Case No. 12-30144;

    e.    Eifler Crane & Hoist Properties, LLC, Case No. 12-30142;

    f.    Crane Erectors, LLC, Case No. 12-30139; and

    g.    American Erectors, LLC, Case No. 12-30138.

3.    Eifler is an investment advisor who jointly owns and operates an investment advisory business with his father.  Eifler has worked with his father in the investment advisory business since approximately 1990.  He has started multiple different business ventures over his career leading up to the filing of his bankruptcy.

4.    This adversary proceeding arises out of Eifler's failed loan obligations related to three personal guaranties and a Home Equity Line of Credit ("HELOC") extended by Wilson & Muir.

2

5.      Eifler and his wife, Ashley Eifler ("Ashley"), were married in July of 1996, and have four school age children.

6.      On or about August 12, 1996, Eifler purchased a house located at 407 Jarvis Lane, Louisville, Kentucky 40207 (the "Jarvis Lane Property").  Even though Eifler was married at the time of the purchase, the house was purchased in Eifler's name alone, and only Eifler's name appeared on the deed.  This property is currently the subject of a foreclosure action, but Eifler and his family still reside in this house.

7.      Eifler purchased the Jarvis Lane Property for approximately $245,000.00, with a $45,000.00 down payment and a $200,000.00 mortgage.

8.      Sometime in 1997, Ashley received an inheritance of approximately $125,000.00, and that amount was applied to reduce the mortgage obligation on the Jarvis Lane Property.

9.      Sometime shortly after the 2005 Hurricane Katrina, Eifler, in consultation with an Ardis E. Greenamyer ("Greenamyer"), decided to enter into the construction crane and hoist industry.

10.     To this end, in early 2006, Eifler formed several companies with which to purchase and lease hoist and crane equipment.  Each company was a single-member LLC, and Eifler was the only member.

11.     To facilitate the purchase of the crane and hoist equipment, Eifler approached several lending institutions about obtaining financing for the equipment.  In part due to a prior banking relationship with Ms. Mary Ellen Robison, who was working as a loan officer with Wilson & Muir at the time, Eifler decided to obtain at least partial financing from Wilson

3

& Muir for the purchase of the equipment.

12.    In 2007, the Wilson & Muir extended four loans to Eifler and/or his companies. Wilson & Muir entered into these multiple agreements on the basis of Eifler's personal financial strength, requiring that Eifler personally guarantee all the loans extended for his commercial crane and hoist businesses.  Wilson & Muir also required that a mortgage be placed on the Jarvis Lane Property for purposes of the HELOC.

13.    In 2007, Eifler made two significant investments.  Eifler purchased an interest in Capital Prospects for $100,000.00 and he purchased an interest in an island project off the coast of Belize, Caribbean Investment Business Limited, also for $100,000.00.  These interests were held in his individual name, and he reflected the value of these interests at $100,000.00 on his personal financial statements.

14.    On January 19, 2007, Eifler submitted his first financing statement to Wilson & Muir, which showed a personal net worth of over $3.9 million (the "January 19, 2007 FS") and stated an annual income of $415,860.00.

15.    On May 11, 2007, Wilson & Muir extended a loan in the amount of $598,242.00 to Eifler Construction Hoist Company, LLC ("Eifler Construction").   In connection with this transaction, Eifler executed a Promissory Note, Commercial Guaranty, and Commercial Security Agreement.  He signed the Promissory Note and Commercial Security Agreement in his capacity as a corporate officer, but personally signed the Commercial Guaranty. Pursuant to the Guaranty Agreement, Eifler personally guaranteed the debt obligation owed to Wilson & Muir.

4

16.     At the time of the bankruptcy petition filing, Eifler owed approximately $391,332.68 on this note.

17.     As of April 8, 2013, the payoff on this loan totaled $427,008.90.

18.     On June 1, 2007, Eifler submitted a second financing statement to Wilson & Muir (the "June 1, 2007 FS"), which showed Eifler with a net worth of $3.3 Million and an annual income of $200,000.00.

19.     On June 7, 2007, Wilson & Muir extended a second commercial loan to Eifler Construction, this time in the amount of $730,152.15.  Eifler similarly executed a Promissory Note, Commercial Guaranty, and Commercial Security Agreement in relation to this transaction. Pursuant to the Guaranty Agreement, Eifler agreed to be held personally liable for this debt as well.

20.     At the time of the bankruptcy petition filing, approximately $489,850.82 was owed on this loan.

21.     As of April 8, 2013, the payoff on this loan totaled $272,331.87.

22.     Thereafter, on August 8, 2007, Wilson & Muir and Eifler entered into a HELOC Interest Only Credit Agreement, pursuant to which Wilson & Muir extended a line of credit to Eifler in the amount of $700,000.00.  Eifler presented evidence that he offered to make Ashley a party to the HELOC, but for some undetermined reason she never became a party to that loan agreement.  In conjunction with the HELOC, Eifler executed a Real Estate Mortgage Revolving Credit Account (the "Mortgage"), granting Wilson & Muir a mortgage to secure the HELOC.

23.    The Jarvis Lane Property served as collateral to secure the Mortgage.  Ashley joined in the Mortgage solely to submit her dower/curtesy interest in the real property recognized by Kentucky state law.  According to the terms of the Mortgage, by signing the Mortgage, Ashley submitted "her interest in the Property, if any, and/or to release . . . her dower or courtesy interest . . . in the Property."

24.    Frank Wilson ("Wilson"), the president and chief executive officer of Wilson & Muir, testified that Wilson & Muir relied on several factors in extending credit to Eifler, including: Eifler's net worth, his debt, his debt to income ratio, other assets including a 1/3 interest in the Fairfax Group (a family real estate holding company), a helicopter, Eifler Properties (the investment company owned and operated by Eifler and his father), and the Eifler construction businesses' assets.

25.    Wilson & Muir also relied upon an appraisal of the Jarvis Lane Property which indicated that this property possessed a value of over $1 million dollars.  It was Wilson & Muir's understanding that Eifler owned the Jarvis Lane Property solely when it extended the HELOC.

26.    Eifler testified that he never believed the property to be worth as much as represented on the real estate appraisal.

27.    The HELOC also included a relatively standard Termination and Acceleration Clause.  That clause provided as follows:

> We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or

make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include for example failure to maintain required insurance, waste or destructive use of the dwelling, failing to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

28.   The HELOC also included a Suspension or Reduction clause, which in appropriate circumstances, would allow Wilson & Muir to suspend additional extensions of credit or reduce the credit limit. One circumstance authorizing a suspension would be if Wilson & Muir reasonably believed that the borrower would be unable to fulfill his payment obligations due to a material change in circumstances.

29.   The HELOC permitted draw requests in various forms, including by telephone, and did not require that the borrower make any representations to obtain a draw.

30.   In practice, Eifler would simply telephone Wilson & Muir requesting a draw on the HELOC, and, if funds were available, Wilson & Muir would then transfer the funds to whatever account Eifler designated.

31.   The customary practice at Wilson & Muir was for a loan officer to sign off on any large draw requests on the HELOC. A HELOC draw request would be approved by a loan officer, no matter how large, so long as the request was within the approved credit limits for the loan.

32.   During the course of the HELOC (August 13, 2007 - October 25, 2010), Eifler made

seventy-eight (78) draws on the account. These transactions would range from as little as $799.69 to the largest and last draw of $340,000.00. Eifler never exceeded the $700,000.00 credit limit.

33. From September 22, 2007, the date of the transfer of the Jarvis Lane Property to Ashley (see below), to October 25, 2007, the date of the last draw, Eifler made thirty-six (36) draws. These draws totaled approximately $820,000.00. In essence, in little over a month, Eifler drew out most, if not all, of the equity in the Jarvis Lane Property.

34. From August 2007 through January 2011, Eifler made thirteen (13) principal pay downs on the HELOC. Approximately $372,165.00 in pay downs were made after the 2009 deed of the Jarvis Lane Property to Ashley (see below). These pay downs ranged from $5,000.00 to a payment of $552,649.83 made on July 23, 2007. Eifler made his last payment of $63,489.00 on October 20, 2010, approximately five (5) days before he drew down the $340,000.00 on October 25, 2010 mentioned above.

35. At the time of the bankruptcy petition filing, Eifler owed $700,901.83 on the HELOC.

36. As of April 8, 2013, the payoff on this loan totaled $698,525.03.

37. Under the Agreement and Mortgage, Eifler promised to pay Wilson & Muir all indebtedness secured by the Mortgage as it came due, and Wilson & Muir reserved the right to declare the entire indebtedness immediately due and payable, upon default under the terms of those documents.

38. On December 24, 2007, Wilson & Muir extended a third commercial loan in the amount of $351,895.00 to Eifler's crane and hoist business, Eifler Tower Crane & Hoist Company,

8

LLC ("Eifler Tower"). Similar to the other transactions, Eifler executed a Promissory Note, Commercial Guaranty, and Commercial Security Agreement in relation to this transaction. As with the other commercial agreements, Eifler agreed to be held personally liable for this debt, as well.

39.    At the time of the bankruptcy petition filing, Eifler owed approximately $279,292.45 on this loan.

40.    As of April 8, 2013, the payoff on this loan totaled $303,927.86.

41.    Thus, in total, Wilson & Muir entered into credit agreements with Eifler totaling $1,680,289.15 for the commercial loans he guaranteed and $700,000.00 for the HELOC personal loan. In total, to the extent the businesses failed to make the required loan payments to Wilson & Muir, Eifler was personally liable for $2,380,289.15. As of April 2013, the claim amounts owed to Wilson & Muir totaled $1,701,793.66.

42.    Wilson testified that the bank had a low "comfort level" in this type of construction equipment lending, and that Wilson & Muir took into account Eifler's net worth and income generating ability when deciding to make these loans. Moreover, Wilson & Muir would not have agreed to the deals without the guaranties and other signs of credit worthiness.

43.    On September 30, 2008, Eifler submitted a third financing statement to Wilson & Muir indicating a net worth of $3.4 million and an income of $200,000.00 (the "September 30, 2008 FS").

44.    On May 11, 2010, Eifler submitted his last financing statement to Wilson & Muir. This financing statement is dated December 31, 2009 (the "December 31, 2009 FS"). The

Financing Statement shows Eifler's net worth to be $2.8 Million. The Jarvis Lane Property is listed under the column of "Tom & Ashley Eifler." Previous financing statements had listed the Jarvis Lane Property under a column with only Eifler's name, with no mention of Ashley.

45. Each of the guaranties included a provision calling for Eifler's payment of attorney fees and expenses incurred by Wilson & Muir in connection with the enforcement of the guaranty.

46. The HELOC also required the payment of collection costs, including attorney fees incurred in connection with collection on the debt.

47. In addition to obtaining financing from Wilson & Muir, Eifler also obtained financing from other lending institutions. By early 2006, Eifler had sought and obtained financing for additional equipment purchases from Stock Yards Bank and Trust Company and JPMorgan Chase Bank.

48. While the hoist and crane construction business initially prospered, the downturn in the economy and difficulties with Greenamyer changed the prospects for these construction businesses.

49. A dispute with Greenamyer eventually led to Greenamyer filing suit against Eifler on February 11, 2009, in Jefferson Circuit Court, Kentucky.

50. The lawsuit sought an unspecified amount of damages, but included damages claims for Greenamyer's alleged ownership share of the companies, compensatory and punitive damages for various breaches, and compensation and expenses for work performed over a two to three year period.

51.  Eifler testified that he never considered the Greenamyer lawsuit a significant risk, although he knew that in litigation unexpected outcomes were possible.  He also knew that Greenamyer claimed a 50% ownership interest in the construction companies, which Eifler had valued at $3.129 million on his December 31, 2009 FS.

52.  In late 2008 or early 2009, Eifler began to market the crane/hoist companies for sale.  Throughout the rest of 2009, Eifler continued to market the crane companies while he operated them.

53.  In July of 2009, Attorney Garry Adams was retained by Greenamyer to represent him in the state court action.  Shortly thereafter, Mr. Adams filed an Amended Complaint on Greenamyer's behalf.

54.  Following Greenamyer's engagement of Mr. Adams in late July 2009, in anticipation of an August trip overseas, the Eiflers consulted an estate planning attorney, James Brown, in order to make arrangements for their four children in the event of a catastrophe while traveling.

55.  During this consultation, Mr. Brown advised the Eiflers to transfer the Jarvis Lane Property into Ashley's name in order to make their marital assets more equally held.  This transfer would allow the Eiflers to take full advantage of the federal estate tax exemptions available at that time (the unified federal estate tax credit).  Mr. Brown routinely gave advice of this nature to couples like the Eiflers based upon estate tax law in 2009.  Prior to this consultation, substantially all of the Eiflers' assets had been titled in Eifler's name only.

56.  Mr. Brown prepared a will, living will, durable power of attorney, designation of healthcare

surrogate and healthcare disclosure authorization for the Eiflers. Mr. Brown also prepared a life insurance trust for the couple. Mr. Brown expedited the preparation and execution of these documents so that they could be completed prior to the Eiflers' August departure.

57. The Eiflers executed these estate planning documents on August 11, 2009. The series of estate planning documents executed on August 11, 2009, did not, however, include any transfers of assets between Eifler and Ashley.

58. The next day, on August 12, 2009, Eifler and Ashley departed on the trip overseas with Mr. Talal Ghali ("Ghali"). Ghali and/or his spouse owned a house on Jarvis Lane, the same street on which the Eiflers live.

59. Pursuant to the advice received from Mr. Brown, on September 22, 2009, after their return from the overseas trip, Eifler executed a deed transferring his entire ownership interest in the Jarvis Lane Property to Ashley. The stated consideration for the transfer was "love and affection and other nominal consideration." Ashley paid no monetary consideration for this transfer. Subsequent to the transfer, Eifler continued to make the mortgage payments on the property and continued to reside in the house.

60. Eifler testified that he decided to make the transfer as part of the estate planning process that he and his wife started prior to the trip overseas.

61. Mr. Brown also testified that the discussions regarding the transfer of the property were made prior to the August trip, even though Eifler did not actually transfer the Jarvis Lane Property until after his return from his trip. Mr. Brown believed the transfer would have been made prior to the trip but for a lack of time.

62. Eifler testified that the transfer was not made in response to the Greenamyer lawsuit, but was instead made solely for estate planning purposes. Indeed, Eifler testified that he made no mention of his creditors at all when consulting with Mr. Brown. Mr. Brown corroborated this testimony, and the Court found Mr. Brown credible on this point.

63. Ashley testified that the reason for the transfer was that she had been pushing Eifler since their marriage in 1996 – 13 years earlier – to divide property with her and that he finally agreed to do it at that time in 2009.

64. Even though the Jarvis Lane Property was the collateral securing the HELOC, Eifler never specifically informed Wilson & Muir of the transfer of the Jarvis Lane Property to Ashley. Eifler did list the Jarvis Lane Property under the column of "Tom & Ashley Eifler" on the December 31, 2009 FS, rather than under a column with his name only as he had in previous financing statements.

65. Wilson glanced at the December 31, 2009 FS, but did not analyze the details of the statement because it still showed Eifler's personal net worth at approximately $2.9 million.

66. Eifler testified he did not feel the need to specifically notify Wilson & Muir of the transfer since Ashley had signed the Mortgage, and he felt Wilson & Muir was still fully secured.

67. Wilson & Muir did not learn of the transfer of the Jarvis Lane Property until several years after the transfer.

68. Wilson testified that if the bank had been made aware of the transfer of the Jarvis Lane Property to Ashley, it would have explored other options with respect to the HELOC.

69. The parties disagreed on whether the transfer actually violated the terms of the HELOC. The

HELOC contained a provision for termination of the Agreement and acceleration of the entire balance due upon the occurrence of any one of the three circumstances, including:

> Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, … transfer of title or sale of the dwelling…

70.    Eifler took the position that since Ashley was included on the Mortgage, Wilson & Muir's position was not adversely affected. Conversely, Wilson & Muir took the position that since it had no contractual relationship with Ashley (other than the Mortgage), the transfer adversely affected its collateral. The Jarvis Lane Property was a significant asset on Eifler's personal financial statements and any disposition as to that property would necessarily adversely affect its collateral.

71.    Following the September 22, 2009 transfer of the Jarvis Lane Property to Ashley, Eifler continued to make substantial draws on the HELOC, knowing that he no longer owned the collateral securing the HELOC Agreement.

72.    The day after the transfer of the Jarvis Lane Property, on September 23, 2009, Eifler drew $60,000.00 on the HELOC. In the twelve months following the transfer, Eifler made 36 draws on his HELOC totaling $820,717.73, eventually drawing the available credit down to approximately zero on October 25, 2010. The draws on the HELOC during the period of September 22, 2009, to October 25, 2010, ranged from $799.69 to $340,000.00, with the average being $22,797.71.

73.    As stated above, Eifler made several payments on the HELOC after the transfer of the Jarvis Lane Property to Ashley. These payments totaled $372,165.00.

14

74. On October 15, 2009, Eifler transferred his interests in the Belize island development project and Capital Prospects to a close friend, Dr. Mike Moskal, for $1 each.

75. Eifler testified that at the time of the transfer, these assets had no value and that he made the transfers solely to claim tax losses. Dr. Moskal, who testified in person, verified Eifler's account of the transfers. Dr. Moskal never considered the island interest or the Capital Prospects interest as assets, or attributed any value to these interests. Eifler and Dr. Moskal's testimonies were very credible on these points.

76. As stated above, on October 25, 2010, Eifler drew the HELOC line of credit down to essentially "$0", taking a draw of the remaining $340,000.00. This draw represented the remaining equity in the Jarvis Lane Property at that time.

77. The very same day, October 25, 2010, Eifler opened a new joint bank account with Ashley at Commonwealth Bank.

78. He deposited the entire $340,000.00 draw funds into the Commonwealth Bank joint account.

79. Also on that same day, October 25, 2010, Eifler opened a joint account with Ashley at Fidelity (the "Joint Fidelity Account").

80. Approximately one week later, on November 1, 2010, Eifler met with Wilson to advise Wilson & Muir of his financial situation.

81. During the November 1, 2010 meeting, Eifler advised Wilson of the following:

    a.    The crane and hoist companies, while in severe financial distress, did have cash in the amount of $150,000.00 at the time of that meeting;

    b.    That Eifler was holding the $340,000.00 draw in a Commonwealth Bank account,

but that it was accessible, and that he planned to use it for "working capital" with regard to the businesses;

c.     That Eifler was negotiating with Ghali to either invest in the companies or to purchase the notes at a discount; and

d.     That Eifler, either personally or for the construction businesses, was considering bankruptcy. Eifler disputed this point, but in light of Wilson's Credit Memo dated November 4, 2010, the Court finds Wilson's testimony on this point more credible than Eifler's testimony.

82.     At that time, in November 2010, Wilson believed that Eifler possessed over $450,000.00 in cash at his disposal (the $340,000.00 draw and at least $120,000.00 in separate cash from the companies).

83.     With respect to the Ghali deals, Eifler also informed Wilson that Ghali indicated he was now interested in buying the notes from the banks at a discount. Ghali's interest had changed from investing in the construction business, which would have resulted in a full payment to Wilson & Muir, to more of a discount note purchase. The nature of the transaction had changed due to the Greenamyer litigation. Ghali would not make the investment in light of the pending Greenamyer litigation.

84.     Ghali also provided credible testimony on this point. He testified that his investment company would not authorize the original transaction due to the Greenamyer litigation. Consequently, Ghali decided to change direction and pursue a discount purchase of Wilson & Muir's notes instead.

85.    Wilson advised Eifler that Wilson & Muir would be willing to consider a discount on the commercial obligations, but Eifler would need to pay something on the deficiencies after a sale of the companies.

86.    Wilson knew that Eifler's income from his investment business had always been lucrative, so there was strong income to pay his debt obligations from that source alone.

87.    On November 2, 2010, one day after meeting with Wilson and telling him that the $340,000.00 was sitting in an account at Commonwealth Bank, Eifler wired the $340,000.00 from the joint Commonwealth Bank account into the Joint Fidelity Account.

88.    On November 4, 2010, Wilson met with Ghali who indicated that he and his business, Verna Vest ("Verna"), considered Eifler's business as a business in distress.  Ghali proposed a purchase price for the notes at 40 cents on the dollar.  Wilson explained that 40 cents would not be acceptable and proposed a 70 cents on the dollar deal.  Ghali did not make any offer above the 40 cents on the dollar at the meeting on November 4, 2010, instead saying he had to discuss the matter with the board of directors at Verna.

89.    On December 10, 2010, Eifler sought legal advice from attorney Tom Frentz ("Frentz"). Frentz had represented Eifler as a creditor in a previous, unrelated bankruptcy case.  While Frentz is a bankruptcy practitioner, at this time it appears that Eifler employed Frentz as a workout specialist to attempt to arrange deals to sell the companies' assets and pay their lenders, including Wilson & Muir.

90.    On December 15, 2010, Ghali e-mailed Wilson and informed him a written offer would be provided by that Friday, December 17, 2010.

91.     On January 4, 2011, Ghali emailed Wilson a non-binding Letter of Intent wherein Verna offered approximately 50 cents on the dollar of the outstanding principal balance.  The deal was conditioned upon Eifler being released from his personal guaranties and upon an agreement among all of the bank creditors.  Eifler's release was not a term which was acceptable to Wilson & Muir.

92.     Also on January 4, 2011, Wilson e-mailed Ghali and informed him that Wilson had spoken to Eifler, and that he had conveyed questions and concerns to Eifler.  Wilson testified that in his conversations with Eifler he explained that Wilson & Muir expected Eifler to make some effort to meet at least a portion of the deficiency balance.  Wilson suggested that Ghali speak with Eifler.

93.     On January 5, 2011, Ghali e-mailed Wilson indicating that he had spoken with Eifler and that Verna would still only reach an agreement to purchase the notes on the terms outlined in the January 4, 2011 Letter of Intent.

94.     On that same date, Wilson & Muir suspended the right to make draws on the HELOC.  The notice indicated that the sole reason for the suspension was Eifler's deteriorating financial condition, not because of any other alleged defaults.

95.     On January 12, 2011, Frentz met with Eifler "regarding all issues."

96.      Frentz's time sheets demonstrate that, in addition to workout solutions, bankruptcy issues were being considered as early as January, 2011.

97.     On January 27, 2011, Marie Fields, a paralegal in Frentz's office, billed time in the Eifler file for preparing a Memo to Frentz on bankruptcy dischargeability issues.

98.    On Monday, January 31, 2011, Frentz again met with Eifler for three hours regarding "all issues."  Eifler contends that bankruptcy was not discussed at this early stage, but in light of Frentz's billing records and the above-mentioned Memo, his testimony on this point is simply not credible.

99.    Sometime in January 2011, Frentz advised Eifler to divide the proceeds from the $340,000.00 draw equally between Eifler and Ashley.

100.   On February 23, 2011, Wilson & Muir commenced a collection action in Jefferson Circuit Court against Eifler and his companies on the three commercial loans.  Wilson & Muir sued Eifler personally in that suit on the three commercial guarantees.

101.   On February 28, 2011, Frentz's time sheets indicate that he was researching preference law under § 547 of the Bankruptcy Code and pre-payments.  The pre-payments referred to tuition pre-payments for Eifler's children, which were eventually paid on December 15 and 16, 2011 (see below).

102.   On March 4, 2011, with the Wilson & Muir's collection action pending and Eifler's answer coming due, Eifler opened up separate individual accounts at Fidelity for himself and Ashley.

103.   On March 8, 2011, Frentz's time sheets reflect an entry for "dischargeability and researching equity line."

104.   On March 29, 2011, with the Answer deadline in Wilson & Muir's collection suit approaching, Eifler transferred $176,927.81 to Ashley's individual Fidelity account, representing one-half of the funds from the $340,000.00 draw (the funds had increased in

value to approximately $355,000.00 from investments made after the October 25, 2010 draw).

105.  Eifler testified that he intended to make the transfer at the time Frentz gave the advice in January 2011, but simply did not get around to it until March 2011, after Wilson & Muir had filed suit.

106.  Ashley assigned Eifler full control over her individual Fidelity account, which included all trading authority and the ability to move funds from that account.  Eifler's authority over that account included the following:

a.      Full trading authority;

b.      The authority to remove cash from the account by sending a check to the address of record or to a preauthorized bank account; and

c.      The authority to transfer cash or assets among other Fidelity accounts held by the same owner.

107.  Ashley testified that she has/had very little knowledge about her individual Fidelity account, other than that the account was opened.  Ashley testified that she did not fill out the financial papers, nor did she read them. She relied completely upon Eifler.

108.  Ashley did not recall seeing the letter to Fidelity directing the transfer of funds from their joint account to their individual accounts.

109.  Ashley testified that she has never written checks from her individual Fidelity account.

110.  Ashley never used the ability to withdraw or transfer funds from her individual Fidelity account; only Eifler exercised that ability.  Eifler fully managed that account, and all activity

20

on that account was Eifler's.

111.   On April 1, 2011, three days after transferring the $176,927.81 to Ashley's individual Fidelity account, Eifler filed an answer to Wilson & Muir's collection suit complaint.

112.   Eifler testified that he made this transfer pursuant to advice obtained from Frentz.  This testimony was corroborated by Frentz's testimony.

113.   Frentz testified that he had concluded from his divorce practice that the house was "marital property."  Thus, in his opinion, the $340,000.00 draw on October 25, 2010, was "marital property" because it represented equity in the home.  Accordingly, based on the concept of "marital property," Frentz theorized a division of the funds with Ashley was defensible.

114.   Frentz testified that he did not know that only Eifler was liable on the HELOC, and that Ashley was not on the HELOC.  Frentz also testified that he did not know of the transfers of the $340,000.00 through the various bank accounts at Commonwealth Bank and Fidelity.

115.   As stated above, Frentz also testified that he advised making this transfer early in his representation of Eifler, well before Wilson & Muir filed its collection lawsuit.

116.   At the time of the transfer, Eifler was actively litigating two state court cases (Wilson & Muir's and Greenamyer's).

117.   Frentz testified that he advised Eifler of the risks of making the transfer; that they discussed the pros and cons "probably in the bankruptcy context."  Frentz also testified that he advised Eifler of the risk that the transfer could be viewed as an insider transfer.  Frentz also testified that he presumed that Eifler understood the risks which were explained to him.

118.   Frentz admitted that he knew from the beginning of his representation of Eifler that

21

bankruptcy was always a possibility.

119.   With full knowledge of the risks, Eifler decided to make the transfer of half of the HELOC proceeds.  It was clear from both Frentz's and Eifler's testimony that Eifler alone decided on the timing of the transfer of the $176,927.81 to Ashley.

120.   Based in part upon Frentz's advice, Eifler contended the transfer was motivated to equalize his and Ashley's assets.  Eifler's testimony on this point is also not credible.  Ashley testified that she had been pushing for a more equal division of assets since 1996, when she and Eifler were married, but it was not until after Wilson & Muir's filing of a collection suit did Eifler decide to transfer these funds to her.

121.   On May 3, 2011, Eifler transferred $41,825.00 to Ashley, representing one-half of their 2010 income tax refund.  Eifler could not recall ever making such a transfer of tax refunds to Ashley in the previous 15 years of their marriage.

122.   Eifler testified that Frentz advised him that he could make the tax refund transfer.  Frentz had no independent recollection of ever having advised Eifler on transferring half of the income tax refund to Ashley.

123.   On July 7, 2011, Eifler wired $20,000.00 to Ashley's sister in Switzerland.  Eifler testified that the sister-in-law in Switzerland was experiencing dire financial circumstances, and needed financial assistance.

124.   Eifler wired these funds from his individual Fidelity account rather than from Ashley's individual Fidelity account.

125.   Eifler admitted that Ashley's account possessed sufficient funds from which this transfer

could have been made.

126.  Eifler testified that he used his account rather than Ashley's because it was "easier." Moreover, Eifler asserted he possessed only trading authority on Ashley's funds, not authority to gift money.  To transfer from Ashley's account to the sister-in-law, Eifler stated he needed to have Ashley sign several documents authorizing the wire transfer from her account.

127.  While this may or may not be true, what is true is that Eifler could easily have had Ashley execute the documents to authorize the wire transfer from Ashley's account, rather than from his account.

128.  Frentz told Eifler, based on the human considerations involved, Eifler should do what was morally right and help his sister-in-law.  Specifically, Frentz testified that he "didn't advise him not to do it."

129.  It is important to note that Frentz did not tell Eifler such a transfer was appropriate or without risks.  Frentz testified that he discussed the risk of making such a transfer and that it could be challenged by creditors.

130.  Frentz testified that he did not know the source of funds Eifler used to pay the sister-in-law. That is, Frentz testified that he didn't know if Eifler used funds from Ashley's account or Eifler's accounts.

131.  Both Eifler and Frentz testified that a definitive decision to move forward with bankruptcy occurred sometime in mid-November 2011, after Wilson & Muir had moved for summary judgment and after the state court had held a hearing on the summary judgment motion.

132.    From December 1 until he filed for bankruptcy on December 29, 2011, Eifler spent almost all the funds in his individual Fidelity account.  His account went from over $177,000.00 to only $22.04.

133.    By contrast, Ashley's individual Fidelity account contained $103,786.73 on the date Eifler filed for bankruptcy.

134.    On December 5, 2011, Eifler withdrew $2,801.41 out of a "Forex.com" ("Forex") account, leaving only $2.34.  This account was a separate currency trading account.

135.    On December 15, 2011, just two weeks before filing for bankruptcy, Eifler transferred $28,234.38 to Ashley.  These funds represented one-half of Eifler's current paycheck.

136.    While Eifler testified that he consulted with Frentz regarding this transfer, Frentz could not recall discussing this matter with Eifler.

137.    Although Frentz testified that he did not remember giving Eifler specific advice regarding the paychecks and joint tax refund, Frentz and Eifler both testified that they spoke nearly every day during the year prior to Eifler's bankruptcy filing.  Further, Frentz also testified that he would not have any reason to dispute Eifler's testimony that he received advice from Frentz on these matters.

138.     Also on December 15, 2011, approximately two weeks prior to filing for bankruptcy, Eifler paid St. Xavier High School $12,000.00 as a prepayment for the following school year, a school year still nine months away.

139.    On December 16, 2011, Eifler paid Sacred Heart Model School a pre-payment of tuition in the amount of $16,900.00 for the following school year, a school year still nine months

away.

140.   Also on December 16, 2011, Eifler paid Sacred Heart Model School another pre-payment of tuition in the amount of $16,175.00 for the following school year, a school year still nine months away.

141.   Eifler testified at trial that he had never prepaid tuition before in this manner.

142.   Eifler testified that he relied upon advice given by Frentz in making the tuition pre-payments.

143.   Frentz testified that he told Eifler he could make the pre-payments of tuition, but also informed Eifler of the accompanying risks of making the pre-payments and that creditors could later challenge the transfers.

144.   It should also be noted that these tuition payments could have been made from Ashley's individual account, rather than from Eifler's individual account.

145.   On December 22, 2011, just one week before filing for bankruptcy, Eifler transferred an additional $3,613.12 to Ashley.  These funds represented one-half of Eifler's final paycheck prior to bankruptcy.  While Eifler testified that he consulted with Frentz regarding this transfer,  Frentz could not recall discussing this transfer with Eifler.

146.   Prior to this point, in the history of his marriage, Eifler had never before paid Ashley half his paycheck until the last two paychecks he received in December 2011, just prior to filing for bankruptcy.

147.   On December 29, 2011, Eifler filed for bankruptcy relief under Chapter 7 of the Bankruptcy Code.

148.    On January 12, 2012, Eifler filed his Bankruptcy Schedules ("Schedules") and Statement of Financial Affairs (the "SoFA").

149.    The Schedules and SoFA contained numerous substantive omissions and errors. Eifler listed only one bank account, a one-half interest in his Joint Commonwealth Bank account, on Schedule B.

150.    Eifler did not list the following bank accounts on Schedule B:

    a.    Eifler's individual Fidelity account;

    b.    The Forex investment account, which Eifler disclosed only after trial in this matter had begun; and

    c.    Eifler's Wilson & Muir checking account.

151.    Eifler did not list under number 11 on his SoFA (financial accounts closed within one year of bankruptcy) the Joint Fidelity Account which he had divided on March 29, 2011, into the two separate individual Fidelity accounts.

152.    Eifler attributed his omission of these accounts as an "oversight." That testimony appears to be disingenuous in light of the fact Frentz testified that Eifler reviewed all of the bankruptcy papers prior to signing the documents. This testimony is also not credible with respect to the Forex account in that nearly all the funds from the account were withdrawn just prior to his bankruptcy filing.

153.    With respect to the Forex account, Eifler tried to assign blame for this failure to schedule upon Wilson & Muir. He contended that Wilson & Muir's delay in discovery production prevented him from listing the account sooner. Of course, Eifler prepared his Schedules and

SoFA well before litigation began in this adversary proceeding. Eifler further contended that Wilson & Muir could have discovered the existence of this account prior to trial, ignoring the fact that the responsibility to list the account on his Schedules and SoFA rested solely upon Eifler.

154.   Eifler additionally failed to disclose on his SoFA many of the transfers that he made during the year leading up to the bankruptcy filing. Specifically, Eifler failed to disclose the following transfers under Number 10 ("Other Transfers," covering transfers outside of the ordinary course of business made within the two years preceding the filing of bankruptcy), or under Number 7 ("Gifts," made within a year of bankruptcy):

a.     The March 29, 2011 transfer of approximately $177,000 to Ashley;

b.     The May 3, 2011 transfer of $41,825.00 to Ashley;

c.     The July 7, 2011 transfer of $20,000.00 to the sister-in-law in Switzerland;

d.     The tuition pre-payments of over $45,000.00 made on December 15 and 16, 2011;

e.     The December 15, 2011 transfer of $28,234.38 to Ashley; and

f.     The December 22, 2011 transfer of $3,613.12 to Ashley.

155.   Frentz testified that he relied on the information Eifler provided to him to draft the Schedules and SoFA.

156.   Frentz said that Eifler would have had three to four opportunities to review the Schedules and SoFA before they were filed: (1) he first has clients fill out the documents in pencil, (2) the Schedules and SoFA were then typed up and reviewed by the client for errors, (3) errors would have been corrected and the documents would have been reviewed again by the client,

and (4) finally, they would have been typed in final, at which time Frentz and the client would have gone over them together. Only after these steps had been taken would the Schedules and SoFA been filed.

157.    Failure to disclose the above-referenced bank accounts, transfers and/or gifts resulted in Wilson & Muir incurring significant attorneys' fees that are the direct result of Eifler's errors and omissions.

158.    On February 2, 2012, the initial Section 341 Meeting of Creditors took place. At that meeting, Gordon Rowe, the Chapter 7 Trustee, asked Eifler about the location of the HELOC proceeds. Eifler testified that half of it was still in Ashley's account. In fact, according to Ashley's bank records, by the time of the meeting of creditors on February 2, 2012, no more than $103,786.75 of the $176,927.81 deposit remained in her account.

159.    The Trustee continued the meeting of creditors to March 1, 2012. During the March 1, 2012 meeting, counsel for Wilson & Muir questioned Eifler regarding a number of the draws on the HELOC account. At that time, Eifler could not explain what was done with many of the various draws. Eifler recollected that questioning at trial and explained that he could not recall without further documents and records in front of him.

160.    Wilson & Muir also met unresponsive answers from Eifler with respect to these transfers at his deposition taken in connection with this adversary proceeding.

161.    At trial, however, Eifler was able to satisfactorily explain the disposition of the various draws.

**CONCLUSIONS OF LAW**

28

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J), and venue is proper under 28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

## LEGAL DISCUSSION

### I.    11 U.S.C. § 523(a)(2)(A)

One of the principal purposes of bankruptcy is to afford a "fresh start" to the "honest but unfortunate debtor." Grogan v. Garner, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(internal quotation marks omitted). This fresh start is effectuated through the discharge of pre-petition debts by operation of 11 U.S.C. § 727(b)[2] and the discharge injunction of § 524(a). See Green v. Welsh, 956 F.2d 30, 33 (2d Cir. 1992) ("The protection afforded by the discharge injunction ... furthers one of the primary purposes of the Bankruptcy Code—that the debtor have the opportunity to make a financial fresh start.") (internal quotation marks omitted). The Bankruptcy Code also provides for the non-dischargeability of certain debts under certain conditions. These debts would be excepted from discharge. This means that the debtor's liability on these particular debts would continue despite having filed for bankruptcy protection.

One of the aforementioned sections excepting a debt from discharge is § 523(a)(2)(A). That section provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> ...

---

[2] All references to Code sections refer to the Bankruptcy Code contained under Title 11 of the United States Code.

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

Wilson & Muir contends that Eifler engaged in a course and pattern of conduct which supports a claim of nondischargeability under § 523(a)(2)(A). Citing <u>McClellan v. Central</u>, 217 F.3d 890, 890 (7th Cir. 2000), adopted by the Sixth Circuit Bankruptcy Appellate Panel in <u>Mellon Bank, N.A. v. Vitanovich</u>, 259 B.R. 873, 877 (6th Cir. 2001), Wilson & Muir contends that these debts should be excepted from discharge due to Eifler's alleged actual fraud. Under the actual fraud prong, a misrepresentation is not essential to find a debt nondischargeable under §523(a)(2)(A). <u>Vitanovich</u> at 877. In <u>Vitanovich</u>, the Sixth Circuit held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." <u>Id</u>.

The Sixth Circuit in <u>Vitanovich</u> set out the requirements of actual fraud.

Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud.

<u>Vitanovich</u> at 877 (<u>citing Gerad v. Cole (In re Cole)</u>, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)).

Wilson & Muir contends that Eifler engaged in a scheme to deprive the bank of its property. It recites a list of actions taken by Eifler which it contends support this argument, including the transfer of the island project interest, the transfer of the Capital Prospects interest, the transfer of the Jarvis Lane Property, the draw down of the $340,000.00 on the HELOC, and the transfer of those

funds to the joint bank account at Fidelity.

The Court does not agree with Wilson & Muir's conclusions on this point. Section 523(a)(2) of the Bankruptcy Code excepts from discharge "any debt ... for money, property, [or] services, ... to the extent *obtained by* ... false pretenses, a false representation, or actual fraud." § 523(a)(2)(A) (emphasis added). The large problem with Wilson & Muir's argument is that many of the actions it complains of (the transfer of the interest in the island, the transfer of interest in Capital Prospects, and the transfer of the Jarvis Lane Property, and the transfer of funds to Fidelity) took place <u>after</u> Eifler had obtained the funds from Wilson & Muir. Thus, those funds were not <u>obtained</u> by the alleged fraudulent conduct. Those events are not related to Eifler's obtaining credit from Wilson & Muir, but rather actions taken after the credit had already been extended.

Moreover, the Court cannot make a finding of fraudulent intent with respect to those transfers. The Court found Eifler's testimony very credible when he explained the purposes for the transfer of the Jarvis Lane Property, the transfer of the island interest, the transfer of the interest in Capital Prospects, and the transfer of the funds to Fidelity. Eifler testified that he has legitimate purposes for these transfers, and in the Court's view the transfers were not made with the intent to defraud Wilson & Muir.

An argument could be made that the $340,000.00 draw may have been "obtained by" fraud. By the time of that draw, Eifler's financial situation was dire, and his construction businesses were struggling, and he was facing a lawsuit by Greenamyer. However, as stated by the Sixth Circuit, a finding of actual fraud requires a finding of an intent to deceive of defraud. Upon consideration of all the evidence, the Court cannot make a finding that the $340,000.00 draw was made with an

31

intent to deceive or defraud. This conclusion is supported by the fact that just five days prior to this draw, on October 20, 2010, Eifler made a significant $63,489.00 payment on the HELOC. Less than four months earlier, he made another significant payment of $278,676.00. These payments evidence an intent to repay rather than an intent to deceive or defraud. The Court can see no reason why Eifler would have made payments or made the significant amount of these payments if he possessed an intent to defraud Wilson & Muir.

Moreover, Eifler's explanation surrounding the circumstances of this draw was consistent and credible. By late October 2010, Eifler knew he would need access to cash in order to continue his efforts to sell the crane companies' equipment and work out company debts, to continue defending the Greenamyer action, and for living expenses. To this end, on October 25, 2010, Eifler drew $340,000 on the HELOC -- an amount that was within its available credit limit. It is certainly understandable that in Eifler's distressed financial situation he would seek to move the available HELOC funds out of his Wilson & Muir account. The transfer of the funds from Wilson & Muir to Commonwealth Bank and then later to the Fidelity account does not alter this conclusion. In short, the Court cannot find that Eifler obtained this money through actual fraud. Either the events took place after the debt was incurred, or Eifler lacked the requisite intent to deceive or defraud. Consequently, the Court finds that Wilson & Muir failed to meet its burden of proof to except these debts from discharge under § 523(a)(2)(A).

## II.     11 U.S.C. § 523(a)(6)

To except a debt from discharge under § 523(a)(6), the debt must be the result of a "willful and malicious injury" in order to be nondischargeable in bankruptcy. That section states, in relevant

32

part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
> * * *
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

§ 523(a)(6).  The Supreme Court interpreted this provision of the Bankruptcy Code in <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  In <u>Geiger</u>, the Court ruled that a debt arising from a medical malpractice judgment, which sounded in negligent or reckless conduct, did not fall within the statutory exception of § 523(a)(6). <u>Id.</u> at 63-64, 118 S.Ct. 974.  In so deciding, the Supreme Court stated:

> the word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury."

<u>Geiger</u>, 523 U.S. at 57, 118 S.Ct. 974 (1998).

As stated above, Wilson & Muir contends its claims are nondischargeable under § 523(a)(6). It claims that Eifler's transfer of the Jarvis Lane Property caused willful and malicious injury by removing the collateral securing the HELOC from the Bank's reach.  Wilson & Muir references the terms of the HELOC, and argues that it had the right to terminate and accelerate the obligations owed under the HELOC if any action was taken that adversely affected the bank's rights to the collateral.   Wilson & Muir contends the transfer adversely affected its right to the Jarvis Lane

Property.  Wilson & Muir equates Eifler's transfer as a type of conversion of a secured's party's collateral.  State Auto. Mut. Ins. Co. v. Chrysler Credit Corp., 792 S.W.2d 626, 627 (Ky. Ct. App. 1990) (internal citations omitted) (holding that the acquisition by a third party of an automobile securing a loan was a conversion of the secured party's collateral).  Wilson & Muir contends that by virtue of transfer of the property, Eifler "wrongfully executed dominion and control over Wilson & Muir's rights in the collateral."  Wilson & Muir also takes issue with the fact that the only consideration received by Eifler from Ashley was love and affection, of which Eifler was the sole beneficiary.

Again, the Court disagrees with Wilson & Muir's conclusions.  Specifically, as stated above, to find a debt non-dischargeable under § 523(a)(6), the creditor must prove that the Debtor willfully and maliciously injured the property of another.  "Willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.  In re Markowitz, 190 F.3d 455 (6th Cir. 1999).

In this case, the Court cannot find that the complained of transfer was done with the intent to injure Wilson & Muir.  The finding is supported by several considerations.  First, Eifler knew that Ashley was still liable on the Mortgage.  Eifler testified that due to the nature of the documents, he believed Wilson & Muir's access to the property would be unobstructed by the transfer.  This was not an unreasonable understanding.  Moreover, under the terms of the HELOC documents which Wilson & Muir drafted, this transfer was not strictly prohibited.  Unlike the case of conversion of collateral as referenced by Wilson & Muir, the terms of the HELOC did not prohibit or otherwise limit the transfer of the property.  Instead, those terms simply allowed Wilson & Muir to terminate

34

or suspend the HELOC if its rights in its collateral were adversely impacted.  Wilson & Muir's comparison to conversion with the transfer of this property simply does not fit.

Perhaps more importantly, Eifler testified that this transfer was undertaken as part of estate planning done immediately prior to an overseas trip.  The Court found this testimony credible and completely supported by the testimony of Mr. Brown.  Mr. Brown testified that he was the one who conceived of the idea to make this transfer, and that the transfer was needed to execute the estate planning being contemplated by the Eiflers.  He stated that the intent behind the transfer was to equalize the assets of the Eiflers, and the best and easiest way to accomplish this was to simply transfer the house.  Mr. Brown's testimony was also very credible and the proposed transfer of assets fit in with the Court's own understanding of this type of estate planning.  In short, the Court cannot find that Eifler made this transfer with an intent to willfully and maliciously injure Wilson & Muir.

## III.    11 U.S.C. § 727(a)(2)

As stated above, chapter 7 debtors receive a general discharge of all pre-petition debts under § 727, unless one of twelve express limitations exists.  These limitations furnish creditors with "a vehicle under which abusive debtor conduct can be dealt with by denial of discharge." Blockman v. Becker (In re Becker), 74 B.R. 233, 236 (Bankr. E.D. Tenn. 1987) (quoting Harman v. Brown (In re Brown), 56 B.R. 63, 66 (Bankr.D.N.H.1985)).

One of those limitations is found in § 727(a)(2).  Section 727(a)(2)(A) reads in pertinent part:

> (a) The court shall grant the debtor a discharge, unless—
> ....
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title,

35

> has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed -
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or

§ 727(a)(2)(A). Wilson & Muir has the burden of proving, by a preponderance of the evidence, that each and every element of the applicable provisions of § 727 has been met. Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir.2000); Hamo v. Wilson (In re Hamo), 233 B.R. 718, 724 (B.A.P. 6th Cir.1999).

Using a plain reading of the statute, if the debtor within one year of filing its petition, transfers property with the intent of frustrating creditors by keeping the property out of its reach, then the debtor is not entitled to a discharge. This section encompasses two elements: 1) a disposition of property, such as concealment, and 2) "a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property." Keeney at 683 (citing Hughes v. Lawson (In re Lawson ), 122 F.3d 1237, 1240 (9th Cir.1997). This section does not deny a discharge every time that the debtor's acts result in a delay or obstruction to a creditor, but to deny a debtor a discharge, the creditor must prove that the debtor intended to hinder, delay or defraud creditors when it transferred property within a year of filing.

Wilson & Muir points to several actions taken by Eifler which it claims evidences an intent to defraud. The Court believes these actions can be broken up into two categories. Those that took place more than a year prior to the bankruptcy, and those that took place in the year preceding the bankruptcy. The Court will first address the actions taken place more than a year prior to the

36

bankruptcy.

First, Wilson & Muir contends that Eifler transferred the Jarvis Lane Property with the intent to hinder, delay or defraud.  Wilson & Muir acknowledges that this transfer took place in 2009, much more than one year prior to the filing of the bankruptcy case on December 29, 2011.  Wilson & Muir tries to avoid this limitations period by arguing a concealment theory.  In Keeney v. Smith (In re Keeney), 227 F.3d 679,684 (6th Cir. 2000), the Sixth Circuit held that a debtor could be denied a discharge based upon the transfer or concealment of property in the year immediately preceding his bankruptcy filing, even though the transfer took place more than one year before the petition for bankruptcy was filed, when elements of a continuing concealment are found to exist. Keeney at 684.

In this case, Wilson & Muir alleges that Eifler concealed the 2009 transfer of the Jarvis Lane Property to Ashley, that Eifler failed to notify the Bank of the transfer of its collateral; that Eifler failed to provide an updated financial statement showing that Eifler no longer possessed an ownership interest in the Jarvis Lane Property, that Eifler continued to live in the home and control the property; and that Eifler continued to pay the mortgage and property taxes on the property.

The Court does not agree with Wilson & Muir's conclusions.  First, the Court cannot find a concealment here as was the case in the Keeney case.  While it is true that Eifler did not notify Wilson & Muir specifically of the transfer, there was no requirement in the HELOC documents imposing such an obligation upon him.  Likewise, while the financial statements did not specifically indicate the transfer of the property, the December 31, 2009 Financial Statement, sent May 11, 2010, did list Ashley, as well as Eifler, as owner of the Jarvis Lane Property.

Second, as stated above in the § 523 discussion, the Court cannot make a finding that Eifler made this transfer with an intent to hinder, delay or defraud.  As discussed above under § 523(a)(6), the Court found this transfer to be part of the Eifler's estate planning, made prior to an overseas trip. The idea to transfer the property was not Eifler's, but instead was done upon the advice of Mr. Brown, Eifler's estate planning attorney.  While it is true that this part of the estate planning process (the transfer) was actually completed after the overseas trip, the fact remains it was conceived of prior to the trip, and but for the timing of the trip, it would have been accomplished contemporaneously with the other estate planning being done prior to the trip.  The explanation and the justification given for this transfer were appropriate and credible, and indicates an intent to properly protect assets as part of an estate planning process rather than an intent to hinder, delay or defraud creditors.  Without a finding of a fraudulent intent on Eifler's behalf, Wilson & Muir's claim for § 727 denial of discharge as to this transfer must fail.

Wilson & Muir also contends that two other 2009 transfers were made with the intent to hinder, delay, and defraud – the transfers to Dr. Mike Moskal.  As stated above, Eifler transferred his interest in the Belize island project to Dr. Moskal for $1.00.  He testified that he believed this asset to be of no value and that he made the transfer in order to recognize a loss for income tax purposes.  Likewise, Eifler transferred his interests in Capitol Prospects, LLC to Dr. Moskal also for $1.00.  Like the island interest transfer, this transfer was also made for income tax purposes. Eifler and Dr. Moskal both testified that they believed these assets to be of no value, and that the transfers were made so that Eifler could claim a loss for tax purposes.  This testimony of Eifler and Dr. Moskal was consistent and credible.  Like the transfer of the Jarvis Lane Property, the Court can

find no intent by Eifler to hinder, delay of defraud his creditors by these transfers.

This takes the Court to the more troubling transfers, those taken within the year of the bankruptcy. In December 2010, Eifler began meeting with his attorney Frentz. Eifler testified that he first met with Frentz for the sole purpose of having Frentz negotiate a workout between Eifler and the multiple banks that had provided financing. He again started meeting with Frentz in early 2011. Eifler testified that at that time he was not considering bankruptcy and that he and Frentz were not discussing the possibility of a bankruptcy. This testimony was not corroborated by Frentz or Frentz's billing records. According to Frentz, bankruptcy was an issue from their earliest meeting. A Memo prepared by Marie Field, a paralegal in Frentz's office, dated January 27, 2011, addressed the dischargeability of debts in a bankruptcy. Four days after the preparation of this Memorandum, Frentz met with Eifler for three hours "regarding all issues." Eifler testimony that bankruptcy was not being discussed at this meeting is simply not credible. It seems clear to the Court that by early 2011, Eifler was pursuing parallel tracks, both a workout approach as well as a bankruptcy approach.        As stated above, Eifler drew down the last remaining equity on the Jarvis Lane Property on October 25, 2010. This draw down was in the amount of $340,000.00. Eifler removed the funds from Wilson & Muir, deposited the funds in Commonwealth Bank, and shortly thereafter moved the funds to a joint account with his wife Ashley at Fidelity Investments. A few months later, on March 31, 2011, Eifler directed Fidelity Investments to split the joint account equally into his and Ashley's separate individual accounts.

This transfer to Ashley of approximately $177,000.00 was done within the one year period preceding bankruptcy, done after Wilson & Muir had commenced its suit against Eifler in state

39

court, and done while Eifler was considering a bankruptcy. Notwithstanding the fact that funds were in Ashley's name alone, Eifler retained full control and authority over the transferred funds. While Eifler denied he was trying to insulate the funds from Wilson & Muir, he did understand that Ashley was not liable to Wilson & Muir on any of the commercial notes and that Wilson & Muir possessed no contractual grounds to bring a claim against Ashley. In sum, by transferring the funds to Ashley, Eifler clearly removed an asset from his portfolio and placed it beyond the reach of his creditors, while still maintaining control and full authority over the funds. Eifler testified that he made this transfer on advice of his attorney, Frentz.

Next, in May 2011, after initial bankruptcy consultations with Frentz, after Wilson & Muir filed suit in state court, and within one year of filing bankruptcy, Eifler received a $83,000.00 income tax refund. The refund was in both Ashley and Eifler's names, but it was attributable solely to Eifler, as Ashley does not work. After receipt of the refund, Eifler transferred to Ashley's separate account $41,825.00. Eifler testified that he made this transfer on advice of his attorney, Frentz. Frentz could not corroborate this testimony, in that he could not recall any specific conversation with Eifler as to these funds. Eifler had never made a transfer of this nature before this date even though he had been married since 1996. In fact, Eifler was not aware of any other transfer or division that he made to Ashley's individual account prior to Wilson & Muir's lawsuit.

On July 7, 2011, after initial bankruptcy consultations with Frentz, after Wilson & Muir filed suit in state court, and within one year of filing bankruptcy, Eifler transferred $20,000.00 to Ashley's sister, Eifler's sister-in-law, due to alleged financial problems the sister-in-law was having. Even though the funds were going to Ashley's sister, Eifler chose to transfer the $20,000.00 from his

individual account, rather than Ashley's separate account. Eifler admitted that Ashley had sufficient funds in her own account to accommodate this transfer, but stated he decided to use his account rather than Ashley's individual account. He also stated that he made this transfer on advice of his attorney, Frentz. Frentz did corroborate that he and Eifler spoke about the sister-in-law, but his recollection was that Eifler should make the transfer, not whether it was appropriate or not.

Next, on December 15, 2011, just two weeks prior to the bankruptcy, Eifler deposited into his joint account that he shared with Ashley, the sum of $56,468.75. This amount represented salary that Eifler had earned from his work at his investment business. On that same date, he transferred to Ashley the sum of $28,234.38. Eifler stated that he also made this transfer upon the advice of counsel. Again, Frentz could not corroborate ever speaking with Eifler about transferring half of his salary to Ashley. While Eifler stated that he had split his salary with Ashley like this in the past, he could not recall any specific examples of such salary splitting. When asked to pin-point a date for these transfers, he testified it was toward the end of 2011, which still would have been the one year look back period under § 727.

Approximately six days later, on December 21, 2011, just eight days prior to the bankruptcy, Eifler again deposited salary into his joint account with Ashley. This deposit was in the amount of $7,226.25. On the next day, he then transferred to Ashley the sum of $3,613.12. He again stated he made this transfer on the advice of counsel, but as stated with the previous transfer, Frentz had no independent recollection of providing advice with respect to Eifler's salary. Thus, in the fourteen days prior to the bankruptcy, Eifler removed over $31,800.00 in salary from his joint account and transferred these funds to his wife's individual account, outside the reach of his creditors.

Finally, on December 15, 2011, again just two weeks prior to filing for bankruptcy, Eifler transferred some $12,000.00 as a pre-payment on tuition for his son to attend private school. This tuition was not yet due, and was in fact paid nearly nine months prior to it being due for the upcoming school year. Similarly, on December 16, 2011, just prior to filing for bankruptcy, Eifler also paid the sums of $16,900.00 and $16,175.00 for his other children to attend private school. Like the previous payment, this tuition was not due and owing, but was a pre-payment for tuition that would not be due and owing until some nine months later. Eifler had never made pre-payments of this nature in the past. Thus, in the two weeks immediately prior to filing for bankruptcy, Eifler divested himself of over $45,000.00 by making pre-payments on tuition costs that were not yet due or owing. As with the previous transfers, Eifler claimed he made these transfers upon advice of counsel.

In sum, in the year preceding the filing of the bankruptcy Eifler made at least six transfers totaling more than $300,000.00 to or for the benefit of an insider[3]. The only real issue is whether Eifler made these transfers with the intent to hinder, delay, or defraud. As stated above, the critical element in any § 727(a)(2) action is proving intent. The intent to hinder, delay, or defraud may be inferred by the bankruptcy court from the circumstances surrounding the debtor's conduct. Keeney v. Smith (In re Keeney), 227 F.3d 679, 684 (6th Cir. 2000) (affirming a denial of discharge by the bankruptcy court on the ground that the debtor had concealed his beneficial interest in certain real properties by placing them in his parents' names while residing on the properties and making the mortgage payments on the properties); Caddlerock Joint Venture II v. Robbins (In re Robbins), 386

---

[3] Under § 101(31), an insider is defined in part as a relative of the debtor.

B.R. 636, 640 (Bankr. W.D. Ky. 2008).

Because it will be a rare occasion when a debtor stands up and admits that he intended to defraud his creditors, courts have developed indicia called badges of fraud. The factors considered by courts as indicators of fraudulent intent include, but are not limited to whether:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was disclosed or concealed;

(4) before the transfer was made, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

See In re Peters, 106 B.R. 1 (Bankr. D. Mass. 1989); Matter of Brooks, 58 B.R. 462 (Bankr. W.D. Pa. 1986). See also In re Steele, 79 B.R. 503, 504 (Bankr. M.D. Fla. 1987).

Looking at all these transfers together, the Court must conclude that Eifler made these transfers with the intent to hinder, delay, or defraud. Applying the factors above, the transfers were

to an insider (Ashley and sister-in-law) or for the benefit of an insider (children's tuition).  With respect to the funds transferred to Ashley, Eifler retained possession or control of the funds transferred.  As will be discussed more fully below, Eifler did not disclose these transfers on his SoFA or in his sworn Schedules.  Both Greenamyer and Wilson & Muir had brought suit against Eifler prior to first of these transfers.

While the Court is not certain if these transfers were "of substantially all the debtor's assets," the Court does note that Eifler transferred over $300,000.00 within a year of the filing of the petition and on his bankruptcy schedules, Eifler listed only $621.00 in cash or funds in a checking account.

With respect to consideration, Eifler received no consideration of reasonably equivalent value for the transfers to Ashley or her sister.  With respect to the timing of the transfers, Eifler filed for bankruptcy within months, and in some cases just weeks, after these transfers were made.

The vast majority of the factors listed above indicate that Eifler possessed an intent to hinder, delay, or defraud when he made these transfers.  Maybe one or two transfers could be understood, but, in this case there were at least six transfers totaling a significant amount of funds made within the year preceding the transfer.  The Court cannot help but find that Eifler was engaging in a scheme to shelter or insulate these assets from the reach of his creditors.

Eifler raises one significant defense with respect to the allegation of fraudulent intent.  Eifler contends he did not posses a fraudulent intent because he was acting on the advice of his counsel, Frentz.  Generally, reliance on counsel can show that a debtor lacked the requisite intent required to deny his discharge.  First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986).  However, the reliance must be reasonable, in good faith, after full disclosure of all pertinent

facts to counsel.  Id.; U.S. v. Lindo, 18 F.3d 353, 356 (6th Cir. 1994); Spring Works, Inc. v. Sarff (In re Sarff), 242 B.R. 620, 629 (B.A.P. 6th Cir. 2000) (advice of counsel defense is only available "where the reliance was 'reasonable' and there was evidence that the debtor acted in good faith after fully disclosing all facts to his counsel"); U.S. v. Swafford, 2004 WL 5575829 (E.D. Tenn. 2004). Finally, the burden of production of evidence in support of the defense rests with the debtor.  Matter of Patterson, 70 B.R. 124 (Bankr. W.D. Mo. 1986).

Upon review of the evidence presented, the Court must conclude that Eifler's alleged reliance on Frentz's advice was neither reasonable nor in good faith.  First, assuming *arguendo* that Frentz did indeed advise Eifler to transfer these assets to or for the benefit of insiders[4], it is simply not reasonable to believe it appropriate to transfer a significant portion of assets within months, or weeks, of filing for bankruptcy.  Moreover, Frentz's legal advice injecting a marital property concept into the bankruptcy context was not reasonable in and of itself.  In re Gotwald, 488 B.R. 854 (Bankr. E.D. Pa. 2013) (advice of counsel defense rejected when advice so unreasonable that it prevented finding of reliance).

Eifler knew his financial condition was worsening and he was aware that the funds retained by him would be part of a bankruptcy estate which would be distributed to his creditors.  Both Wilson & Muir and Greenamyer had filed suit and he had been having bankruptcy discussions with Frentz abut a possible bankruptcy for months.  Rather than conserving assets, Eifler took multiple, deliberate steps to shield his assets from creditors.  His reliance upon the advice of Frentz to

---

[4] Frentz had no independent recollection of having advised Eifler as to the transfer of the tax refund or the salary splits.

minimize his assets permits only one reasonable inference: Eifler knew he was going to file for bankruptcy and was attempting to shield his assets from the legitimate claims of his creditors, including Wilson & Muir.  His "whole pattern of conduct" supports a finding of fraudulent intent. In re Adeeb, 787 F.2d 1339 (9th Cir. 1986).

In Adeeb, the debtor claimed that he lacked actual intent to hinder or delay his creditors because he relied on the advice of his attorney who advised him to transfer title to some of his real property to third parties who could be trusted.  Id. at 1341.  The Ninth Circuit rejected Adeeb's defense, stating that since both Adeeb's counsel and Adeeb *knew that the purpose of the transfers was to hinder or delay Adeeb's creditors*, such knowledge precludes the defense of good faith reliance on the advice of counsel, even if the client is otherwise innocent of any improper purpose. Id. at 1343 (emphasis added). "A debtor who knowingly acts to hinder or delay his creditors acts with the very intent penalized by section 727(a)(2)(A)." Id.

Like in the Adeeb case, in this case, both Eifler and Frentz *knew* that the purpose of these transfers was to hinder or delay Eifler's creditors.  Simply speaking, no other credible purpose can be gleaned from the evidence.  The Court finds that Eifler's explanation that these transfers were part of some marital property division wholly implausible.  Other than the Jarvis Lane Property transfer which the Court has accepted was done for estate planning purposes, Eifler had never taken steps to divide marital property before these transfers were made.  The Court finds it wholly unbelievable that during this financially difficult time, Eifler would only then decide that he should start dividing his marital assets with Ashley.  Conversely, it is wholly believable and far more likely that these transfers were made with the sole intent to shelter the assets from his creditors.

46

Eifler's reliance on Frentz's advice was also unreasonable because circumstances had changed significantly between the time Frentz provided his advice and Eifler acted. Specifically, Frentz advised Eifler on the HELOC proceeds transfer prior to suit being filed by Wilson & Muir. It was only after Wilson & Muir filed suit, however, that Eifler made the decision to transfer the HELOC funds to Ashley. While Frentz may have advised Eifler to split the joint Fidelity account with Ashley, this advice was somewhat "stale" in that additional circumstances had intervened between the time of the advice and the transfer, namely the Wilson & Muir lawsuit.

Likewise, Frentz advised Eifler on tuition pre-payments in early 2011. It was not until December 2011, weeks prior to the bankruptcy and <u>after</u> Wilson & Muir had moved for summary judgment in the state Court action, that Eifler decided to make the tuition pre-payments and remove over $45,000.00 from his assets. Intervening circumstances, namely the March 4, 2011 collection action and Wilson & Muir's pending summary judgment motion, changed the landscape between the time Frentz provided the advice and when Eifler transferred the funds. Reliance on "stale" advice is not reasonable.

Eifler's advice of counsel must also fail because Frentz testified that he fully informed Eifler of the possible consequences of making the transfers. Frentz "talked [with Eifler] about certain risks of making such a transfer, whether it was in the context of bankruptcy or not." Frentz and Eifler "talked about the risk that might run with an insider transfer" should he ever have to file bankruptcy. While not specifically recalling a discussion on the law of fraudulent conveyances, Frentz did recall speaking to Eifler about "general things that might be perilous" and the risk that some might characterize his transfers as "insider transfers." Finally, Frentz testified that he presumed Eifler

understood the risks attendant in the transfers he was making. Frentz fully explained the possible, and probable, consequences to Eifler for making these transfers, yet Eifler decided to proceed with the transfers notwithstanding Frentz's warnings. In other words, Frentz's warnings had no effect on Eifler's decision to continue his course of conduct. Indeed, the quantity and degree of warning call into question whether Eifler relied in good faith at all. In re Adeli, 2009 WL 7809009 (9th Cir. B.A.P. 2009) (advice with cautionary preface "is sufficient to put any reasonable person on notice that the advice about to follow could not be relied upon in good faith.")

The Court finds that Eifler's attempt to rely upon the "advice of counsel" defense fails as his reliance was neither reasonable nor in good faith. Accordingly, the Court finds that Eifler made the above-referenced transfers within one year of the filing of the bankruptcy and with the intent to hinder, delay, or defraud.

## IV.    11 U.S.C. § 727(a)(4)

The Court could stop here, having found sufficient grounds to deny Eifler discharge based upon § 727(a)(2). The Court will, however, also make the finding that Eifler discharge should also be denied under § 727(a)(4).

Any debtor who files a Chapter 7 petition has a continuous, affirmative duty to disclose the following in a complete and accurate manner: (a) a list of creditors; (b) schedules of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs. Browning Mfg. v. Mims ( In re Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir.1999). According to the Sixth Circuit, "[a] debtor has an affirmative duty to disclose all of its assets to the bankruptcy court." Browning v. Levy, 283 F.3d 761, 775 (6th Cir.2002).

48

Debtors who fail to meet their duty are subject to having their discharge denied under § 727(a)(4). Denial of discharge under § 727(a)(4)(A) requires proof that: "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." In re Keeney, 227 F.3d at 685.

False oaths may be in the form of either false statements or omissions on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings – at the 341 meeting of creditors or at testimony given at Rule 2004 exams made under oath. See, e.g., Hamo v. Wilson (In re Hamo), 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999). However, not every omission results in a denial of discharge. Cadle Co. v. Pratt ( In re Pratt ), 411 F.3d 561, 566-67 (5th Cir. 2005). The omission must be material. Statements are material if they concern the discovery of assets or the existence and disposition of a debtor's property. In re Keeney, 227 F.3d at 686 (citation omitted). A debtor has knowledge of the statement if "the debtor knew the truth, but nonetheless failed to give the information or gave contradictory information." In re Hamo, 233 B.R. at 725 (quotation marks and citation omitted). "[A] knowingly false statement or omission made by the Debtor with reckless indifference to the truth will suffice as grounds for the denial of a Chapter 7 general discharge." Id.

In this case, the record is replete with false oaths made by Eifler. Eifler did not disclose on his SoFA the $177,000.00 transfer to Ashley from the HELOC draw. He did not disclose his transfer of half of his income tax refund to Ashley. He did not disclose his two transfers of salary made within two weeks of the filing of the bankruptcy. He did not disclose his $20,000.00 transfer

of funds to his sister-in-law.  He did not disclose his pre-payments of tuition.  He did not disclose an individual Fidelity brokerage account.  He did not disclose the Joint Fidelity Account.  He did not disclose the Forex currency trading account.[5]  Finally, he testified falsely at his 341 meeting about how much of the HELOC proceeds were still in Ashley's individual account.

During the trial, Eifler repeatedly referred to the transfers to Ashley as "divisions" rather than transfers.  Specifically, he contended that because he was sharing what he considered marital property, his actions should not be considered as transfers.  This line of reasoning is completely without merit.  Section 101(54)(D) defines "transfer" to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."  Under this definition, Eifler actions clearly constituted transfers as he disposed or parted with property or an interest in property.  Under any reasonable interpretation of this statute, Eifler made transfers to Ashley.

Each of these disclosures, or more accurately lack of disclosures, concerned the existence and disposition of Eifler's assets.  Moreover, the disclosure of the banking/ investment accounts could have led to the discovery of recoverable assets by the Chapter 7 Trustee.  Chapter 7 trustees rely heavily upon full and accurate disclosure from debtors in bankruptcy.  Omissions from the sworn schedules and statements of financial affairs, like the ones described here, impede the Chapter

---

[5] Wilson & Muir also contended that Eifler's inclusion of a tuition expense on his Schedule J of expenses was a false oath.  Specifically, it contended that in light of the tuition pre-payments, Eifler had no monthly tuition expenses at the time of the bankruptcy filing.  Eifler testified that Schedule J of his bankruptcy petition, reflecting tuition, was prepared based on a budget that Eifler drafted prior to making the tuition prepayments.  He attributed the failure to update that budget after the prepayment as mere inadvertence.  The Court found Eifler's testimony on this point credible.

7 trustee's ability to not only determine which assets are available, but also hinder their efforts to investigate what other assets may be available to pursue. Bank accounts are particularly relevant in this respect in that they provide a trail for trustees to follow to determine where and to whom assets were transferred. This is commonly referred to as the "tracing of assets" process. By failing to list banking accounts, a trustee is unable to trace any transfers to or from those banking accounts. It is the activity in the accounts, as well as the existence of the accounts themselves, that might lead a bankruptcy trustee to discover recoverable assets for a bankruptcy estate.

Eifler was aware of all these facts when he filed for bankruptcy on December 29, 2011, yet he failed to disclose the information on his SoFA and Schedules. When Eifler listed none with respect to transfer and/or gifts and when he failed to list banking accounts, he was making a false statement under oath.

This case is akin to the facts set forth in the case of In re Beckham, 421 B.R. 602 (6th Cir. B.A.P. 2009). In that case, like the one before this Court, the debtor made numerous material misrepresentations and omissions in her bankruptcy filing. "The cumulative effect of these multiple inaccuracies established a pattern of reckless indifference to the truth which permitted the bankruptcy court to infer that the Debtor knowingly and fraudulently made false oaths in connection with her bankruptcy case, and warranted denial of the Debtor's discharge under § 727(a)(4)(A)." Id. at 9; see also Economy Brick Sales, Inc. v. Gonday (In re Gonday), 27 B.R. 428, 432 (Bankr. M.D. La. 1983) ("[T]he cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth [to support] fraudulent intent.").

Here, Eifler's numerous material misrepresentations and omissions warrant an inference that

he knowingly and fraudulently made false oaths in connection with the filing of his bankruptcy case. These were not simple de minimis omissions, but instead material omissions and misstatements that could have affected the administration of his bankruptcy estate.  Looking at the totality of the circumstances, and considering Eifler's recklessness with respect to the accuracy of his Schedules and SoFA, the Court must infer that Eifler submitted these sworn documents with the intent to deceive.  In re Miller, 39 F.3d 301, 305 (11th Cir.1994).  See also In re Phillips, 476 Fed. Appx. 813 (11th Cir. 2012) ("Indeed, because debtors generally will not testify as to their own misconduct, that a false oath was made knowingly and fraudulently is generally proven by circumstantial evidence or inferences drawn from circumstances surrounding the debtor.") (citations omitted).

Eifler defends his failure to make these disclosures upon mistake and oversight.  The Court finds this explanation unconvincing.  Again, a single mistake could be explained in such a fashion. The multiple omissions in this case evidences more than single error, but instead a pattern of false statements.  Eifler's testimony attributing the omissions to oversight is not credible and leads to the natural conclusion that Eifler either intended to omit this information or acted with an intentional recklessness as to the veracity of his SoFA and schedules.  While the Court acknowledges that Eifler was dealing with personal issues with respect to his wife's medical condition, and that at the same time he was filing for bankruptcy for his related companies, the Court cannot find that Eifler simply overlooked transfers totaling over $300,000.00.  Moreover, the Court cannot find that Eifler simply overlooked multiple banking accounts.  This Court is satisfied that Wilson & Muir adequately proved Eifler's fraudulent intent by proof of his repeated misrepresentations, omissions, and failures to disclose.

To the extent that Eifler also relies upon an advice of counsel defense to this count as well, such defense is also not well taken with respect to this allegation. Typically, if an item is omitted upon the honest advice of counsel, to whom the debtor has disclosed all pertinent facts, the item will not be deemed falsely omitted. <u>Hibernia Nat'l Bank v. Perez</u>, 124 B.R. 704, 710 (Bankr. E.D. La. 1991), <u>aff'd</u>, 954 F.2d 1026 (5th Cir. 1992). However, "the advice of counsel is not a defense when it is transparently plain that the property should be scheduled." <u>Perez</u>, 124 B.R. at 710 (Bankr. E.D. La. 1991) (<u>quoting</u> In re Mascolo, 505 F.2d 274, 277 n. 4 (1st Cir. 1974)).

In this case, it is "transparently plain" that these transfers and bank accounts should have been disclosed in the Schedules and on the SoFA. Eifler testified he provided his information to Frentz to draft the documents, Eifler reviewed the documents, Eifler signed the documents, and Eifler directed the filing of the documents. Consequently, Eifler must accept responsibility for the information or lack of information in the SoFA and Schedules. <u>In re Stanton</u>, 2007 WL 2538431 (S.D. Tex. 2007) (<u>citing Morton v. Dreyer ( In re Dreyer )</u>, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991). Furthermore, "the number of inaccuracies and omissions made throughout the bankruptcy proceeding by the [Debtors] make their assertion of reasonable reliance even less convincing." <u>Stanton</u> at 7. Eifler, by his multiple omissions, has sufficiently demonstrated that he possessed the requisite intent to commit fraud under § 727(a)(4). The Court finds that Wilson & Muir presented more than sufficient evidence to support a finding that Eifler's discharge should be denied under § 727(a)(4).

## V.     11 U.S.C. § 727(a)(5)

Again, the Court could stop at this point, having found sufficient evidence to deny Eifler a

discharge under §§ 727(a)(2) and (4).  The Court will, however, also address Wilson & Muir's contention that Eifler's discharge should be denied under § 727(a)(5) due to his alleged failure to satisfactorily explain the loss or deficiency of assets to meet his obligations.  Eifler made 36 draws from his HELOC within the approximately one-year period from September 22, 2009, to October 25, 2010, totaling $820,717.73.  Wilson & Muir contends that Eifler was unable to adequately explain these draws.

Section 727(a)(5) provides that a bankruptcy court may deny the discharge of debts when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  "Under § 727(a)(5), a satisfactory explanation 'must consist of more than ... vague, indefinite, and uncorroborated' assertions by the debtor."  Matter of D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996). In actions brought under § 727(a)(5), the plaintiff has a preliminary burden of presenting evidence that demonstrates that the debtor formerly owned substantial, identifiable assets that are now unavailable to distribute to creditors.  See Banner Oil Co. v. Bryson (In re Bryson), 187 B.R. 939, 955 (Bankr. N.D. Ill. 1995).  If the plaintiff makes this showing, the debtor then has the burden of establishing a "satisfactory" explanation for the asset reduction. See Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 619 (11th Cir.1984).

Here, Wilson & Muir met its burden of showing that Eifler formerly owned substantial, identifiable assets that are now unavailable to distribute to creditors.  These assets consisted primarily of the HELOC proceeds.  In the Court's opinion, however, Eifler adequately and satisfactorily explained the loss of assets.  While it was true that Eifler could not give an adequate

explanation to many of the HELOC draw downs at his § 341 meeting of creditors, his 2004 examination, or even his depositions given as part of this adversary proceeding, Eifler was able, at the trial in this case, to provide a sufficient explanation for these proceeds. Eifler's explanations may have lacked the detail wanted by Wilson & Muir, they still provided an adequate explanation for the disposition of the funds.

Eifler testified that most of the funds were either used for normal living expenses, transferred to insiders, or deposited into a trading account. As Eifler is a financial advisor, depositing the funds into a trading account is not only reasonable, but somewhat completely expected. This explanation is reasonable and sufficient under the circumstances and Eifler took "such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." Lacy Wholesale & Main Factors v. Bell, 156 B.R. 604, 605 (Bankr. E.D. Ark. 1993). The Court cannot find that Eifler was evasive or vague with respect to his answers as to these draws. Indeed, at trial Eifler was more than forthcoming about the disposition of his assets prior to filing for bankruptcy. In short, Wilson & Muir failed to meet its burden of proof with respect to its claim under § 727(a)(5) and the Court will not deny Eifler a discharge under this section.

## VI.    Conclusion

Upon consideration of the evidence presented at this trial, the Court finds that Wilson & Muir is entitled to a judgment against Eifler in the amount of $1,701,793.66 based upon the amounts owed under the guaranties and the HELCO. Wilson & Muir is entitled to pre-judgment and post-judgment interest at the federal rate, costs, and attorneys' fees. Wilson & Muir failed to carry its burden of proof with regard to its claims under §§ 523(a)(2) and (a)(6). The Court was not

persuaded that Eifler fraudulently incurred these debts or that he willfully and maliciously injured Wilson & Muir or Wilson & Muir's property.  Wilson & Muir was, however, able to carry its burden of proof with respect to its claims under §§ 727(a)(2) and (a)(4).  Within the year preceding the filing of the bankruptcy, Eifler made numerous, significant transfers to or for the benefit of insiders.  These transfers were made with the intent to hinder, delay, or defraud his creditors.  Similarly, Wilson & Muir was able to sufficiently prove that Eifler knowingly and fraudulently made a false oath or account in connection with the bankruptcy case.  On these two grounds, the evidence was overwhelming and Eifler's defenses of inadvertent omission and "advice of counsel" were unconvincing.  The Court shall enter a Judgment this same date in accordance with the holding of this Memorandum.

_____
Alan C. Stout
United States Bankruptcy Judge

Dated: July 1, 2013

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| THOMAS O'HEARN EIFLER, JR. | ) | Case No. 11-36154 |
| Debtor | ) | |
| | ) | |
| WILSON & MUIR BANK & TRUST | ) | |
| COMPANY, | ) | |
| Plaintiff | ) | |
| vs. | ) | AP No. 12-3052 |
| | ) | |
| THOMAS O'HEARN EIFLER, JR. | ) | |
| Defendant | ) | |

## JUDGMENT

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that Judgment is rendered in favor of the Plaintiff and against the Defendant in the amount of $1,701,793.66, plus pre- and post judgment interest, costs, and attorneys' fees.  Plaintiff is given twenty-one (21) days to file an affidavit with respect to its attorneys' fees.  Defendant shall have fourteen (14) days thereafter to respond.

**IT IS FURTHER ORDERED** that the Defendant be, and hereby is, denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2) and 727(a)(4).

_____
Alan C. Stout
United States Bankruptcy Judge

Dated: July 1, 2013